IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICH AUREL, #317239          *
      Plaintiff,
       v.                           *       CIVIL ACTION NO. ELH-18-1251

WEXFORD HEALTH SOURCES, INC.    *
WILLIAM BEEMAN
R.N.P. KRISTA BILAK               *
MAHBOOB AHRAF, MD
DR. AKAL MULUGETA             *
      Defendants.
                                       *****

**<u>MEMORANDUM OPINION</u>**

Mich Aurel,[1] the self represented plaintiff, is a State inmate housed at the North Branch Correctional Institution ("NBCI"). He is a frequent litigator in this Court. On January 26, 2018, the Court dismissed his civil rights complaint in *Aurel v. The Staff of Wexford Health Sources, et al.*, Civil Action No. ELH-17-1201 (D. Md.), upon finding that defendants had provided Aurel with adequate medical care under the Eighth Amendment. *See id.*, ECF 23; ECF 24.

On March 26, 2018, Aurel filed an Affidavit in that case (ECF 25), asserting that for years he has not received proper medical care for his symptoms, and that health care staff continue to lie to him about treatment and medications for his symptoms related to lower back, abdominal, and throat pain; infection of his tongue; thyroid, liver, prostate, and colon cancers; gastrointestinal problems (constipation, ulcer, and blood in stool); and positive test results for Hepatitis A & B

---

[1] The Maryland Department of Public Safety and Correctional Services ("DPSCS") lists plaintiff as Mich Aurel on its "inmate locator" website. Although plaintiff was prosecuted as Aurel Mich in the Maryland courts, I will refer to him by way of the DPSCS designation of Mich Aurel.

(HAV and HBV).[2] On March 28, 2018, Aurel filed a motion for a preliminary injunction and a temporary restraining order. *Id.*, ECF 26. Aurel complained that he has been threatened by medical staff and denied medication for symptoms and injuries. The pleading also discusses injuries and medical conditions including, but not limited to, Aurel's back pain caused by a 2016 fall from a top bunk; pain in his throat, neck, ears, bladder, and abdomen; infection to the tongue; swollen lymph nodes (possible thyroid cancer); and HAV and HBV. Further, he contends that his organs have started to fail due to the lack of adequate medical treatment over the past four years. *Id.*

Although the case (ELH-17-1201) was already closed, and Aurel is subject to the bar of 28 U.S.C. § 1915(g), the court directed defendants to file a court-ordered response. *Id.*; ECF 27. They did so on April 23, 2018. *Id.*, ECF 28. In addition, defendants provided authenticated medical records and the Affidavit of Asresahegn Getachew, M.D. *See* ECF 28-2; ECF 28-3.

By Order of April 30, 2018, I determined that it would be appropriate to construe Aurel's submissions in ELH-17-1201 as the original and supplemental complaint in an entirely new case. *See* ELH-18-1251. Therefore, Aurel's Affidavit is construed as the Complaint, docketed at ECF 1. His motion for preliminary injunction is docketed as ECF 2. Defendants' court-ordered response, supported by an exhibit and an affidavit, appears at ECF 3; ECF 3-2; ECF 3-3. It shall be construed as a motion for summary judgment ("Motion").

Aurel was twice provided notice of the court's construction and the opportunity to file an opposition. ECF 4; ECF 5. Aurel filed an opposition (ECF 6), which he supplemented by Affidavit of June 8, 2018. ECF 9. Defendants filed a reply (ECF 7), with an exhibit. By Order of May 30, 2018 (ECF 8), the Court directed defendants to file an addendum to their Reply, so as to include

---

[2] The Affidavit is docketed as a Motion for Emergency Relief.

documentation in support of their assertions. The supplementation has been provided. ECF 10; ECF 10-1.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, defendants' motion for summary judgment shall be granted.

**I. Background**

Aurel alleges that he has been denied medical treatment for symptoms related to lower back, neck, ear, abdominal, bladder, and throat pain; infection to his tongue; thyroid, liver, prostate, and colon cancers; gastrointestinal problems (constipation, ulcer, and blood in stool); and positive test results for HAV and HBV. He seeks treatment (medication and operations) from a specialist for his avowed conditions.[3]

In response, defendants state that Aurel is a fifty-two year old male incarcerated at NBCI. They have provided two affidavits of Asresahegn Getachew, M.D. ECF 3-3; ECF 10-1. Dr. Getachew is a licensed physician employed by Wexford Health Sources, Inc. ("Wexford") as the acting Medical Director at NBCI. ECF 3-3, ¶ 1; ECF 10-1, ¶ 1.

Dr. Getachew avers that Aurel has a medical history for hypothyroidism; asthma;

---

[3] Aurel has filed many cases complaining that he was denied medical treatment for numerous maladies. The cases were fully briefed and dismissed upon my determination that Aurel had received extensive and constitutionally adequate medical care. *See*, *e.g.*, *Aurel v. Wexford, et al.*, Civil Action No. ELH-13-3271 (D. Md.); *Aurel v. Warden, et al.*, Cvil Action No. ELH-15-1127 (D. Md.); *Aurel v. Wexford Health Sources, et al.*, Civil Action No. ELH-15-1797 (D. Md.); *Aurel v. Wexford Health Sources, et al.*, Civil Action No. ELH-16-1293 (D. Md.); *Aurel v. The Staff of Wexford Health Sources, Inc., et al*., Civil Action No. ELH-17-1201 (D. Md.).

Although Aurel is subject to the § 1915(g) bar, the court has been extremely cautious when examining Aurel's medical claims, and has given his allegations the benefit of the doubt. The court will not turn a deaf ear to Aurel's allegations regarding his medical care, but cautions him that he must structure his allegations in a less generalized manner, and cannot relitigate issues that have already been addressed.

constipation; hypertrophy of prostate; cough; hyperlipidemia; an esophageal reflux positive tuberculosis ("TB") skin test without active TB disease; positive HAV AND HBV surface antibody tests in 2009; seasonal allergies; syncopal episodes with implanted cardiac monitor, which was surgically removed in 2006; micro fractures of the right foot diagnosed in 2011, with calcaneous deformity and chronic apophysitis; and a surgically repaired left lateral ankle fracture with retained hardware. ECF 3-3, ¶ 4; ECF 10-1, ¶ 3. Further, Getachew maintains that Aurel has a mental health diagnosis of hypochondria. ECF 3-3, ¶ 4.

According to Getachew, Aurel's current medications include Zyrtec for his allergies; Simvastatin for high cholesterol; Mobic for pain; Prilosec for esophageal reflux[4]; Synthroid (levothyrotine sodium)[5] for hypothyroidism; Miralax[6] for constipation; Capsaicin ointment for topical pain relief; Terazosin[7] to improve urination; Amitriptyline for pain; and a Proair Hfa (albuterol)[8] inhaler as needed, to control asthma. ECF 3-3, ¶ 6. Getachew opines that, to a

---

[4] Prilosec is a proton pump inhibitor that decreases the amount of acid produced in the stomach. It is used to treat symptoms of symptoms of gastroephageal reflux disease ("GERD") and other conditions caused by excess stomach acid. *See* https://www.drugs.com/prilosec.html. Simethicone is used to relieve the painful symptom of too much gas in the stomach and intestines. *See* http://www.mayoclinic.org/drugs-supplements/simethicone-oral-route/ description/drg-20068838.

[5] Levothyroxine Sodium is used to treat an underactive thyroid (hypothyroidism). It replaces or provides more thyroid hormone, which is normally produced by the thyroid gland. *See* http://www.webmd.com/drugs/2/drug-1433/levothyroxine-oral/details.

[6] Miralax is used to treat constipation. *See* www.webmd.com/drugs/2/drug-4576/colace-oral/details and http://www.webmd.com/drugs/2/drug-17116/miralax-oral/details.

[7] Terazosin is a prescription drug used as an alpha-adrenergic blocker to treat high blood pressure and enlarged prostate. See https://www.rxlist.com/consumer_terazosin_hytrin/drugs-conditon.htm.

[8] ProAir Hfa is indicated in the maintenance treatment of asthma. *See*

reasonable degree of medical probability, these medications are appropriate for Aurel's medical conditions. *Id.*

Getachew indicates that Aurel is not scheduled for surgery. *Id.* ¶ 7. Further, Aurel utilizes a back brace against medical advice, as his medical conditions do not indicate a current need for any assistive device. *Id.* ¶ 8. In addition, Aurel has a well-documented history of incorrectly self-diagnosing himself with bone, prostate, thyroid, throat, and colon cancer, none of which have been medically diagnosed or supported by clinical data; infections of various organs and body parts, which have not been diagnosed by "gross" examination or lab work-up; and subjective claims of acute pain, "neither corroborated by observation nor physical abilities which show normal movements and no impairment in ability to complete normal daily activities." ECF 3-3, ¶ 9.

Moreover, Getachew avers that Aurel "engages in obsessive behavior frequently fixating on certain symptoms" of a disease or condition, and has a "tendency to amplify these symptoms in presentation and they form the basis of his misdiagnosis." *Id.* ¶ 10. The doctor also asserts that Aurel is "a poor historian" who "frequently confuses symptoms he has reported, and treatments and medications received." *Id.* According to Dr. Getachew, Aurel "refuses to accept clinical evidence, particularly when that evidence contradicts his own diagnoses," and he often contends that "lab results have been fabricated." *Id.*

Getachew claims that Aurel has been diagnosed by psychiatry as hypochondriacal and, because of this condition and his "habitual conduct of accessing health care, [Aurel's] plan of care until December 2017 included a biweekly evaluation by a mid-level provider." *Id.* ¶ 11. In

---

http://www.rxlist.com/qvar-side-effects-drug-and center.htm and http://www.empr.com/proair-hfa/drug/2918/.

December 2017 the plan of care was changed to monthly evaluations. *Id*.; *see* ECF 3-2 at 32-33, 40-41, 52, & 62-63.

According to Getachew, Aurel has been "non-compliant with his medications" ECF 3-3, ¶ 12, and the pharmacy has been instructed to require him "to sign for his keep on person medications," and Aurel is to be directly observed when taking his chronic care medications. *Id.* Getachew maintains that Aurel does not have thyroid, prostate, colon, or eye cancer, and his lab results were and are normal. *Id.* ¶ 13. Moreover, Aurel had an unremarkable colonoscopy in 2016. His guaiac stool tests are normal. *Id.* Aurel's evaluation by the optometry department in February 2018 was unremarkable, aside from his need for corrective lenses. *Id.* His lymph nodes are not enlarged. Aurel's gums, throat, and tongue have been evaluated by both medical and dental providers and were found to be unremarkable. *Id.* Aurel has not demonstrated fatigue, rectal bleeding, or night sweats. Although Aurel has been educated as to these findings, he "refuses to believe" the medical providers' assessments. *Id.*; *see* ECF 3-2 at 2-3, 23-28, 35-36, 43, 47-50, & 53.

As noted, Aurel does have certain chronic conditions, including hypothyroidism, asthma, and hyperlipidemia, but they are monitored with chronic medical care. ECF 3-3, ¶ 14. But, the conditions are controlled with medications, *i.e.*, Synthroid, albuterol inhaler, Simvastatin, and fiber supplements. *Id.* Further, Aurel has been advised to increase his activity level and to follow an exercise plan in light of his medical conditions and obesity. *Id.*; *see* ECF 3-2 at 2, 20-22, & 40-42. Dr. Getachew states that Aurel will "continue to be regularly seen at chronic care and to have access to medical staff at all times via the sick call process." ECF 3-3, ¶ 21.

Getachew avers that Aurel frequently complains of low back and hip pain radiating down his right leg to his foot. ECF 3-3, ¶ 15. According to Getachew, Aurel has no anatomical

disorder and an x-ray of his "LS spine" was normal, as was that of his right hip. *Id.* Aurel has been examined by an orthopedist, Roy Carls, M.D., who has only recommended conservative treatment with stretching exercises. *Id.* Aurel completed a course of physical therapy in 2017, with improvement to his antalgic gait. ECF 3-3, ¶ 15.[9] Aurel has indicated he no longer wants any physical therapy. *Id.* Previously, Aurel was treated with Neurontin, Baclofen, Cymbalta, Mobic, and Robaxin, but he has consistently requested to be placed on Vicodin and Tramadol. He is being scheduled for an MRI of the back for a further determination of his complaints of pain. *Id.*; *see* ECF 3-2 at 4-8, 9-25, 27-30, 35-36, & 47-51.

Getachew asserts that Aurel often complains of abdominal pain and his frequent constipation is being treated with Miralax. An ultrasound of the abdomen, taken in January of 2018, was unremarkable, except for indications of "hepatic steatosis (fatty liver)." ECF 3-3, ¶ 16. But, Aurel's liver function tests are normal. *Id.* Getachew also states that Aurel has an 11 mm. benign cyst on his liver. *Id.* Aurel has discontinued a cardiovascular diet, but remains on a 2400 calorie diet. He has been advised to lose weight due to his obesity. *Id.*; *see* ECF 3-2 at 23-24, 27-30, 34-36, 39, 49-50 & 56.

According to Getachew, Aurel's claims regarding HAV and HBV are "misinformed." He does not have HAV, HBV or HCV, but has tested positive for Hepatitis A and B antibodies because, according to Getachew, he has had the Twinrix vaccine. ECF 3-3, Getachew Aff., ¶ 17; ECF 3-2 at 31 & 49-50.

Getachew affirms that Aurel complains of frequent urination, but work-ups have not

---

[9] An antalgic gait is a gait that develops as a way to avoid pain while walking. It is a form of gait abnormality where the stance phase of gait is abnormally shortened relative to the swing phase. It can be a good indication of pain with weight-bearing. *See* https://www.google.com/search?q=antalgic+gait&oq=antalgic&aqs=chrome.

determined a clinical cause for this complaint. ECF 3-3, ¶ 18. His PSA and other lab results are normal. *Id.* Nor does Aurel not have an enlarged prostate. *Id.* And, he is not diabetic. *Id.* He is prescribed Terazosin for his urinary condition. *Id.*; *see* ECF 3-2 at 6.

Getachew asserts that Aurel often complains of throat pain and sore throat, but his throat, ears, and turbinates[10] were not found to be red. ECF 3-3, ¶ 19. His lymph nodes are normal. Aurel was prescribed lozenges, but they were discontinued after he reported that they did not help. Getachew states that the use of inhalers for asthma can cause or exacerbate sore throats, GERD, and coughing. And post nasal drip from allergies can cause a sore throat. Aurel is prescribed Zyrtec for allergy symptoms. *Id.*; ECF 3-2 at 32-33.

In his opposition, Aurel focuses on the cyst found on his liver. He observes that nowhere does the record state that the cyst, which is growing by 1 mm. a year, is benign. He seeks a biopsy of the cyst and its removal by laser or radiation. ECF 6 at 2. Aurel continues to complain of his treatment for lower back pain, as well as numbness to his right hip, hand, and shoulder. *Id.* Further, he maintains that medications provided to him are not helping. *Id.*

In the reply (ECF 7), as supplemented (ECF 10; ECF 10-1), defendants assert that Aurel's CT scan in 2015 reported an 8 mm. lesion of the liver, which was too small to characterize. ECF 7 at 2; ECF 10-1, ¶ 4. And, a 2018 CT scan reported an 11 mm. "hypoechoic area likely representing a small cyst [of the liver] consistent with the 2015 CT scan." *Id.* According to Dr. Getachew, the hypoechoic area "was considered a benign nodule or cyst for a number of reasons," including that "Aurel's liver function tests were all normal." ECF 10-1, ¶ 4. Moreover, "fatty infiltration can be a cause of a hepatic pseudomass." *Id.* And, a "localized area

---

[10] A turbinate is a bone in the nose that is situated along the side wall of the nose and is covered by mucous membrane. *See* https://www.google.com/search?q=turbinates.

of normal hepatic tissue should also be considered among the possible causes of hypoechoic areas in persons with a fatty liver." *Id.* Notably, plaintiff has been diagnosed with "a fatty liver." *Id.*

Dr. Getachew also asserts that a special treatment plan was developed for plaintiff "due to his hypochondriac diagnosis and submission of frequent sick call slips." ECF 10-1, ¶ 5; *see also* ECF 3-3, ¶ 11. As noted, plaintiff has been found non-compliant with his medications. *Id.* ¶ 12.

Dr. Getachew maintains that Aurel incorrectly alleges in ECF 9 that he has been prescribed the wrong medications for pain. ECF 10-1, ¶ 6. And, he reiterates that Aurel does not have the various concerns with which he claims he is afflicted. *Id.* ¶ 7. He opines, to a reasonable degree of medical probability, that plaintiff has received appropriate medical treatment. *Id.* ¶ 8.

## II. Standard of Review

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original); *see Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most

favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (second alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

As indicated, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because Aurel is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III. Discussion

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *DeLonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v.*

*Seiter*, 501 U.S. 294, 297 (1991)). The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of ... inmates." *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016).

Notably, "[n]ot all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.' " *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319–21 (1986)). In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance. *See Farmer*, 511 U.S. at 834; *Thompson*, 878 F.3d at 97.

In order to state an Eighth Amendment claim for denial of adequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. at 106; *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). A "'serious ... medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

The deliberate indifference standard consists of a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98

(quoting *Farmer*, 511 U.S. at 834, 837-38).[11] The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and, subjectively, that the prison staff was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer*, 511 U.S. 837. Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-40. As the *King* Court reiterated, 825 F. 3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'" (Citation omitted). Although this "'entails more than mere negligence ... it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id*. (quoting *Farmer*, 511 U.S. at 835).

In order "[t]o show an Eighth Amendment violation, it is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178. In other words, deliberate indifference requires a showing that the defendant disregarded a substantial risk of harm to the prisoner. *Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001); *see Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that

---

[11] In excessive force cases, "courts must determine 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Thompson*, 878 F.3d at 98 (quoting *Hudson v. McMillian*, 503 U.S. 1, at 6-7 (1992)).

the conduct is inappropriate in light of that risk.").

As the *Farmer* Court explained, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If a risk is obvious, however, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105.

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 755 F.3d at 178; *see Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it ... [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences ... To lower this threshold would thrust federal courts into the daily practices of local police departments."). Therefore, mere negligence or malpractice does not rise to a constitutional level. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle v. Gamble, supra*, 429 U.S. at 106). Moreover, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).

Even if the requisite subjective knowledge is established, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

I am satisfied here that no constitutional violation has been established. The medical records and affidavits of Dr. Getachew speak for themselves. There is no dispute that Aurel has been seen countless times by physicians, nurses, and physician assistants for his many complaints. He has been prescribed a host of medications for his conditions, including Simivastatin, Zyrtec, Terazosin, Cymbalta, Levothyroxine Sodium, Miralax, Tolnaftate, Prilosec, and Proair HFA. Lab tests were performed. He received CT scans; x-rays, and a colonoscopy. Although Aurel may be dissatisfied with the course of treatment and the views of the health care staff, the testing and treatment he received has more than satisfied the constitutional requirements under the Eighth Amendment.

Aurel seeks injunctive relief, complaining that he has had untreated symptoms of right side abdominal pain, blurred vision, coughing and throat and chest pain. A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). Under the law in this circuit, the party seeking a preliminary injunction must establish that "he is likely to success on the merits at trial; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S.7, 19 (2008); *Real Truth About Obama, Inc. v. Federal Election Com'n,* 575 F. 3d 342, 346 (4th Cir. 2009), vacated on other grounds, 558 U.S.1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

The *Winter* standard requires the district court to find that the party seeking the injunction has made a "clear showing" that he is likely to succeed on the merits. *Winter,* 555 U.S. at 22. This standard compels the moving party to show that he is *likely* to prevail. Regardless of the balance of hardships, it is insufficient for the party to show only that "grave or serious questions are presented" in the litigation. Second, the moving party must make a clear showing that he is likely to be irreparably harmed if preliminary relief is denied. To meet this test, the party must show more than a mere *possibility* of harm. Third, the moving party must show that the balance of equities tips in his favor. *Id.* at 20. Fourth, the district court must consider whether the grant or denial of the injunction is in the public interest. The court must give "particular regard" to the public consequences of granting a preliminary injunction. *Id.* at 9, 24; *Real Truth,* 575 F.3d at 347.

Courts should grant preliminary injunctive relief involving the management of prisons only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269

(4th Cir. 1994). A plaintiff must show that the irreparable harm the prisoner faces in the absence of relief is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).

Aurel has failed to show that he will succeed on the merits of his case and that he will be subject to immediate and irreparable harm if emergency relief is not granted. There is no demonstration of deliberate indifference on the part of medical staff. Injunctive relief is not warranted.

## V. Conclusion

For the aforementioned reasons, defendants' motion for summary judgment shall be granted. Aurel's request for injunctive relief shall be denied. A separate Order effecting the rulings made in this opinion is entered herewith.

Date: June 19, 2018 _____/s/_____
Ellen L. Hollander
United States District Judge